3:24-mj-00215

DISTRICT OF OREGON, ss:                          AFFIDAVIT OF CARYN J. ACKERMAN

### Affidavit in Support of a Criminal Complaint and Arrest Warrant

I, Caryn J. Ackerman, being duly sworn, do hereby depose and state as follows:

### Introduction and Agent Background

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since February 13, 2011. My current assignment is with the Portland Field Office, investigating financial crimes, public corruption, and federal civil rights violations. My training and experience include a law degree from the University of Oregon in 2007, successful completion of training at the FBI Academy in Quantico, Virginia, as well as subsequent participation in various trainings related to corruption, civil rights crimes, and money laundering.

2.      I submit this affidavit in support of a criminal complaint and arrest warrant for **Biao Lin**, with date of birth 4/xx/1997, for engaging in a Conspiracy to Commit Mail and Wire Fraud, in violation of Title 18, United States Code, Sections 1341, 1343, and 1349. As set forth below, there is probable cause to believe, and I do believe, that **Biao Lin** engaged in a Conspiracy to Commit Mail and Wire Fraud, in violation of Title 18, United States Code, Sections 1341, 1343, and 1349.

3.      This affidavit is intended to show only that there is sufficient probable cause for the requested complaint and arrest warrant and does not set forth all of my knowledge about this matter. The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, interviews of witnesses, a review of records related to this investigation, communications with others who have knowledge of the events and circumstances described herein, and information gained through my training and experience.

**Applicable Law**

4.Title 18, United States Code, Section 1341, prohibits a person, having devised a scheme to defraud, from obtaining money or property by means of false or fraudulent pretenses, representations, or promises and for the purpose of executing the fraud or attempting to do so placing, depositing, or causing to be deposited any matter to be sent or delivered by the Postal Service or any private or commercial interstate carrier.

5.Title 18, United States Code, Section 1343, prohibits a person, having devised a scheme to defraud or obtaining money or property by means of false or fraudulent pretenses, representations, or promises, from transmitting or causing to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

6.Title 18, United States Code, Section 1349, prohibits a person from conspiring or attempting to conspire to commit mail fraud, in violation of Title 18, United States Code, Section 1341, or wire fraud, in violation of Title 18, United States Code, Section 1343.

**Background**

7.On October 2, 2024, Adult Victim 1 (AV1) walked into the Portland Field Office of the FBI with her husband, Adult Victim 2 (AV2), and her son, to report she and her husband had been defrauded out of millions of dollars in gold bars at the direction of someone named "Michael Lewis" (hereinafter "Lewis"). Further, AV1 was still in contact with Lewis, and they were expected to provide additional gold at Lewis's direction within the next few days. At the time of their reporting to the FBI on October 2, 2024, AV1 was 86 years old, and AV2 was 93

**Page 2 – Affidavit of Caryn J. Ackerman**

years old, and they had lost more than $3 million, as a result of this scheme. AV1 and AV2 are residents of Portland, Oregon.

## Statement of Probable Cause

8. According to AV1, this all started on or about June 10, 2024, when AV1 tried to access her online accounts with Vanguard Group, where she had a trust account containing several million dollars, as well as an IRA with several millions of dollars as well. However, instead of gaining access to her account, AV1 was notified her password was not working, and she was locked out of her account. AV1 was then called by someone purporting to be with the Vanguard fraud department and they told AV1 she had been locked out. In fact, AV1 was not contacted by someone from the Vanguard Group, but rather someone purporting to be who was instead a part of this fraud scheme.

9. AV1 was then called again by someone who identified himself as "Christopher Tyler" (hereinafter "Tyler"), also purportedly with the Vanguard fraud department. He was not. Tyler told AV1 her account had been hacked, that her Social Security number had been stolen and they had reported this to the Social Security Administration, that someone had tried to steal money from her Vanguard account, and that she had to take certain safety procedures to ensure her accounts would be safe. AV1 was then put in touch with "Anna Graves" (hereinafter "Graves") at phone number (210) 460-7700, purportedly with the fraud section of the Social Security Administration; Graves in turn put AV1 in touch with "Michael Lewis" (hereinafter "Lewis") at (410) 452-3406, who was purportedly with the Social Security Administration and was being assigned to her case. He was not actually with the Social Security Administration but

rather another member of the fraud scheme.  AV1 began communicating with Lewis with the goal of protecting her accounts from fraud.

10. On or about June 11, 2024, at Lewis's direction, AV1 installed on her computer a software program called UltraViewer.  According to UltraViewer's website, it is a free remote desktop software, which allows a user "to remote control your client's computer to support them like you're sitting in front of the screen."  Lewis also asked for information about AV1's personal life, including details about her banking institutions, grocery stores, and neighbors.  Lewis told AV1 he did not know the identities of the hackers putting AV1's accounts at risk, so AV1 must not tell anyone else or go on the Internet to seek information.

11. Lewis told AV1 that Vanguard only insured accounts up to a certain amount and since AV1 had more than that in her accounts, Lewis advised AV1 she had to move her money or else she would lose her money to these hackers.  Lewis then directed AV1 to go to US Bank to buy gold bars as a way to safeguard her assets and that she then needed to transfer the gold to the U.S. Treasury for safekeeping, and after her accounts were deemed safe, they would transfer it back to her.

12. On or about June 24, 2024, AV1 used her US Bank account to initiate a wire transfer in the amount of $466,043 USD to purchase gold bars, as directed by Lewis.  Upon successful completion of this first purchase and conveyance of the gold bars, AV1 returned to US Bank to repeat the process and buy additional gold bars.  However, US Bank refused to carry out the transfer.  Lewis directed AV1 to open a new account at the Washington Federal Bank.  The rest of the gold purchases were made via wire transfer from the Washington Federal account, which was funded by AV1's Vanguard accounts.

**Page 4 – Affidavit of Caryn J. Ackerman**

13. Throughout the weeks that followed, AV1 continued to purchase gold bars at the direction of Lewis.[1] These purchases were made with several different online gold vendors. Lewis initiated the wire transfer with Washington Federal for each purchase, and Lewis would advise AV1 to be available to verify the transaction with the bank. Soon thereafter, AV1 would receive an automated call from the bank asking her to verify the transaction.

14. Upon receipt of the gold bars via FedEx, AV1 took pictures of the gold bars and accompanying packing slips. The photos were sent to Lewis via text message, who would then contact her soon thereafter to repackage the gold bars on video. AV1 repackaged the gold bars at Lewis's direction, as he watched on video, wrapping them in Christmas or birthday paper.

15. Within a short amount of time, Lewis then recontacted AV1 to advise that a courier was on their way or imminently arriving to pick up the package. At this time, Lewis would provide AV1 with a password and tell her to ask the courier for the password before giving them the package. A courier would then arrive at her home, AV1 would ask the courier for the password, and then would hand the courier the package after receiving the password. Typically, Lewis remained on the phone with AV1 during the pickup.

16. AV1 said that the couriers were not from UPS, USPS, or FedEx, and they were dressed in normal attire. On several occasions, the courier was the same male individual,

---

[1] On or about July 4, 2024, AV1 was contacted by two agents with another federal investigative agency who advised she may be the victim of a fraud scheme. However, AV1 doubted whether the agents were really law enforcement officers. Lewis told AV1 he knew about the agents, and everything was under control, causing AV1 to continue making gold bar purchases at his direction. The FBI has confirmed the two agents who contacted AV1 were actual law enforcement agents with another agency.

**Page 5 – Affidavit of Caryn J. Ackerman**

identified only as "Kevin." However, the last pick up before AV1 visited the FBI, the courier was an Asian woman accompanied by an Asian man in a car.

17. On each occasion, sometime after the package was conveyed, AV1 received from Lewis, via the Internet, what purported to be a U.S. Treasury check for the value of the gold bars. This process of purchase, repackaging, and pick up of the gold bars was repeated on multiple occasions, resulting in a total loss of over $3,000,000 in gold.

18. On or about October 1, 2024, AV1 again made a purchase of gold bars via an online vendor in the amount of $462,398, as directed by Lewis. Since the time of that purchase, AV1 revealed the situation with Lewis to her son and the FBI. AV1 expected to receive the gold bars via FedEx with three to four days. Lewis continued to contact AV1 on October 2 and 3, 2024, but AV1 told Lewis her husband was in the hospital to limit interaction.

19. On or about October 3, 2024, AV1 was notified by FedEx that the package would be delivered to her residence in Portland, Oregon between 9:00AM and 1:00PM on Friday, October 4, 2024. AV1 believed Lewis was also likely to know when the package was scheduled for delivery, as she had observed him access her computer to view emails and other items. Lewis would then expect her to immediately repackage the gold bars on video. Further, AV1 expected that soon after repackaging the items, a courier would arrive at her house with a password to pick up the package. Agents advised AV1 to let Lewis know her husband was out of the hospital, and FBI Agents prepared a controlled pickup operation that took place on October 4, 2024.

20. On October 4, 2024, FBI Agents instructed AV1 to proceed with the process she had previously followed upon receipt of the gold via FedEx. AV1 took photos of the gold,

which consisted of five one-kilogram gold bars and three smaller 100-gram gold bars, and sent them via text message to Lewis, then she waited for his direction to repackage them on video. FBI Agents also directed AV1's son to assist with preparing a decoy package, which would not actually contain gold bars, to be handed to the courier. A picture of the gold bars is below:



21.     At approximately 11:25PM, Lewis advised AV1 two couriers[2] would be coming for pick up, and the couriers may not arrive until 2:30PM or 3:00PM. Lewis then proceeded to direct AV1 to package the gold in two separate boxes with one box containing two kilograms of gold and the other box containing 3.3 kilograms of gold. Lewis also directed AV1 to package the boxes in Christmas paper with the white side facing out. Lewis then directed AV1 to write her initials and the amounts on the boxes. AV1's son then proceeded to assist in preparing two decoy packages to match those previously packaged on video.

22.     At approximately 3:45PM, Lewis called AV1 and stated the courier was outside, but upon opening her front door, AV1 found no one around. Soon thereafter, FBI Agents

---

[2]     In later communications that followed, Lewis referred to only one courier.

**Page 7 – Affidavit of Caryn J. Ackerman**

observed a Kia Soul with a Pennsylvania license plate parking near AV1's driveway, and then begin to proceed up the long driveway toward AV1 and AV2's residence. AV1 and AV2's residence is in Portland, Oregon. During this time, AV1 remained on the line with Lewis, who conveyed the password was "Richard." At approximately 3:50PM, the courier arrived at the door, and AV1 asked him for the password. The man, later identified as **Biao Lin** (hereinafter "**Lin**"), uttered the password "Richard," and AV1 then handed him the two boxes. After **Lin** gained possession of the boxes and began to walk away from the house, FBI Agents moved in and placed him in custody.

23. As FBI Agents engaged with **Lin**, **Lin** refused to acknowledge any understanding of the English language. Agents began efforts to obtain the assistance of a Mandarin interpreter to communicate with **Lin**.

24. With the assistance of a Mandarin interpreter translating by phone, Agents provided **Lin** his constitutional *Miranda* warnings, and **Lin** acknowledged understanding his rights and agreed to speak with the Agents. **Lin** explained he was randomly approached by an unknown Asian man about a week ago in a New York City library. **Lin** said was offered $200 to fly somewhere to pick something up, and he agreed. The man gave **Lin** a phone, which was not password protected. **Lin** was told he would get instructions on that phone.

25. **Lin** stated he flew into Spokane, Washington yesterday, October 3, 2024, and he made no other stops except to drive directly to Portland. **Lin** said the person who gave him directions on the phone spoke Mandarin with a western accent. **Lin** stated he was told to pick up a package, but he was not told any passwords. **Lin** was supposed to get additional information via phone after picking up the package, but instead he was arrested. **Lin** denied knowing what

Page 8 – Affidavit of Caryn J. Ackerman

he was picking up. He advised he had only his suitcase and backpack in the car, and he said the car did not contain any drugs, money, weapons, or gold.

26. On **Lin**'s person, Agents found what appeared to be part of a Delta boarding pass for a flight from Atlanta to Spokane. No date or time was observed. Concealed in **Lin**'s jacket was $5,000 in the form of 50 crisp one-hundred-dollar bills, and Agents found $1,394 in cash in his wallet. **Lin** advised he had not yet been paid for making this pick up, as he was supposed to be paid afterward. According to **Lin**, he had to pay for the car rental and flight on his own.

## Conclusion

27. Based on the foregoing, I have probable cause to believe, and I do believe, that **Biao Lin**, date of birth 4/xx/1997, has engaged in a Conspiracy to Commit Mail and Wire Fraud, in violation of Title 18, United States Code, Sections 1341, 1343, and 1349. I therefore request that the Court issue a criminal complaint and arrest warrant for **Biao Lin**.

///

///

///

28.     Prior to being submitted to the Court, this affidavit, the accompanying application, and the requested arrest warrant were all reviewed by Assistant United States Attorney (AUSA) Scott Kerin and AUSA Kerin advised me that, in his opinion, the affidavit and application are legally and factually sufficient to establish probable cause to support the issuance of the requested criminal complaint and arrest warrant.

<u>By phone pursuant to Fed R. Crim. P. 4.1</u>
Caryn J. Ackerman
Special Agent
Federal Bureau of Investigation

Sworn in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone at ___9___ (a.m./p.m.) on October ___5___, 2024.

*Stacie F. Beckerman*
_____
HONORABLE STACIE F. BECKERMAN
UNITED STATES MAGISTRATE JUDGE

Page 10 – Affidavit of Caryn J. Ackerman